521 So.2d 946 (1988)
PETERBILT MOTORS COMPANY
v.
Joseph MARTIN and Joann Martin.
PETERBILT OF MOBILE, INC., and Grady M. Steele
v.
Joseph MARTIN and Joann Martin.
86-191, 86-192.
Supreme Court of Alabama.
February 12, 1988.
*947 Michael D. Knight of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for appellant Peterbilt Motors Co.
Marion A. Quina, Jr., and Caroline L.C. McCarthy of Lyons, Pipes & Cook, Mobile, for appellants Peterbilt of Mobile, Inc., and Grady M. Steele.
Ab Powell III of Powell, Powell & McKathan, Andalusia, for appellees.
SHORES, Justice.
Joseph and Joann Martin, husband and wife, both work as long-distance, over-the-road truckdrivers. They sued Peterbilt Motors Company (hereinafter "Manufacturer"); Peterbilt of Mobile, Inc., a Peterbilt franchise dealer (hereinafter "Dealer"); Detroit Diesel Allison; Caterpillar Tractor Company; and Grady M. Steele. The complaint claimed damages for breach of warranty in the sale of a Peterbilt tractor, as well as damages for the alleged fraud of defendants Peterbilt Motors Company, Peterbilt of Mobile, Inc., and Steele, in the sale of that tractor.
The facts are largely undisputed:
In the summer of 1984, the Martins decided to purchase a new tractor, specifically a Peterbilt tractor, as they believed the Peterbilt to be the "best on the road." The Martins first checked prices in Knoxville, Tennessee, for new Peterbilt tractors, but they decided the prices in Knoxville were too high. Some time later, the Martins spotted an attractive Peterbilt tractor at a rest stop. They asked the driver about the tractor, and were told that he bought it from "Chuck" Steele at a Peterbilt dealership in Mobile, Alabama. The Martins had previously bought a Kenworth tractor from Mr. Steele at another dealership, so they called him to get his estimate on the price of a new Peterbilt tractor. The price quoted by Steele was less than the purchase price in Knoxville, and, therefore, the Martins went to Mobile to discuss with Steele the specifications for their new tractor. The tractor was to contain a Caterpillar engine and a Detroit Diesel Allison automatic transmission, each of which was warranted by its own manufacturer, not by Peterbilt Motors Company, and a Jacobs *948 brake system, which was to be installed at the dealership.
On July 20, 1984, the Martins signed a retail order for the purchase of their Peterbilt tractor, and paid $2,500 to the Dealer as a deposit. The Martins noted that the order form, as well as various other objects around the dealership, prominently displayed the logo of the Manufacturer, Peterbilt Motors Company.
When the tractor was delivered to the dealership, its mechanics attempted to install the Jacobs brake system in accordance with the Martins' order. However, after the installation was completed, the Dealer's personnel learned that the Jacobs brake system was not working because the tractor's electrical wiring system was not allowing any voltage to pass to the brake. In an attempt to correct the situation, the Dealer's service manager called the Manufacturer and reported the electrical wiring problem. When the Manufacturer was unable to give the Dealer the information it needed, the Dealer made some changes in the tractor's basic wiring on its own, "more or less in the dark." The Dealer then filed a warranty claim with the Manufacturer, describing the steps taken to correct the wiring problem. Unknown to the Dealer, while its "rewiring" corrected the problem with the Jacobs brake system, it compounded a wiring error previously made by the Manufacturer at the factory during the tractor's production. This change created the problems about which the Martins have complained.
After correcting the problem with the Jacobs brake system, the Dealer's employees detected a problem with the tractor's gears. Upon learning of this, Steele called a representative of the tractor's transmission manufacturer, and explained the problem. Believing that its employees' inexperience in driving tractors with automatic transmissions was the real cause of these new problems, the Dealer made no further efforts to correct the problem, nor did Steele notify the Martins of the "jerking motion" detected after the Jacobs brake system was installed.
On November 2, 1984, the Martins took delivery of their new Peterbilt tractor and gave the Dealer a check for $27,500 and executed a note and security agreement for $87,672, to be paid over the next four years. The Dealer did not tell the Martins about the wiring and shifting problems, and the Martins left the dealership with their new tractor.
Over the next six months, the Martins continually experienced serious problems with this tractor. The record is filled with pages of evidence regarding complaints made to the Dealer about "low power" or "jerky or hard shifting of gears," but upon each such complaint the Dealer referred the Martins to Caterpillar engine or Detroit Diesel Allison transmission dealers for repairs. One particular incident occurred on November 6, 1984, just four days after the Martins got the tractor. On that day, the Martins took the tractor to an authorized Detroit Diesel Allison dealer for repairs. The dealer's mechanic examined the tractor, and told the Martins that "something was hooked up wrong." The mechanic called the Dealer to ensure that it would be responsible for any work done with the tractor's electrical system. After talking to the Dealer, the mechanic told the Martins that the Manufacturer had been contacted also, and that it admitted that it had sent the wrong diagram to the Dealer so that the tractor was incorrectly wired. (No timely objection was made to this testimony, and, thus, it was properly admitted.) Later, around November 8, 1984, still experiencing problems with the tractor, the Martins went to a Peterbilt dealer in California, where they were told there was nothing that the Manufacturer could do. On November 16, 1984, the Martins returned the tractor to the Dealer for further repairs, still complaining about "high fuel consumption, low power, and a hard shift," yet no effective repairs were made. Finally, in April 1986, about one-and-a-half years later, Elmo Pratt, a zone service manager for Detroit Diesel Allison, examined the tractor and discovered that all of the tractor's problems stemmed from a mistake in the electrical wiring system. The tractor was improperly wired, and it had been improperly *949 wired since its delivery to the Martins in November 1984. There was testimony that this problem could be corrected in about 15 minutes, at a cost of $10.
The Martins sued the Manufacturer, the Dealer, Caterpillar, Detroit Diesel Allison, and Grady M. Steele. The first two causes of action were against the Manufacturer for breach of warranty, implied and express. The third cause of action was against Detroit Diesel Allison for breach of a separate warranty covering only the transmission, and the fourth was against Caterpillar for breach of its warranty for the tractor's engine. The last several causes of action were against the Dealer, Steele, and the Manufacturer, under various fraud theories.
The case was tried to a jury, which returned a general verdict of $73,500 against the Manufacturer, and another general verdict of $73,500 against the Manufacturer, the Dealer, and Steele. The jury found in favor of Caterpillar Tractor Company and Detroit Diesel Allison. The trial court entered judgments based on these verdicts. The Manufacturer, the Dealer, and Steele appeal. We affirm the judgment of $73,500 against Peterbilt Motors Company, and affirm the judgment of $73,500 against Peterbilt of Mobile, Inc., and Grady M. Steele. We reverse the duplicate judgment in a like amount against Peterbilt Motors Company.
I. The Manufacturer
The Manufacturer conceded at the trial of this case that the tractor delivered to the Martins was defective in that it had improperly installed the electrical wiring during the manufacturing process. Its expert witness testified that this would have caused the tractor to jerk or snatch as the gears shifted. The Manufacturer, while conceding that the defect existed, seeks to avoid liability on its warranty by asserting that it was not given an opportunity to correct the defect. The evidence simply will not support this argument. There was ample evidence to support the jury's verdict on the breach of warranty claim and to support the amount awarded on this claim. As the Manufacturer concedes, § 7-2-719(2), Code of Alabama 1975, allows recovery of damages other than those provided by the remedy described in the warranty, where circumstances cause an exclusive or limited remedy to fail of its essential purpose. As far back as 1969, this Court, in Tiger Motor Co. v. McMurtry, 284 Ala. 283, 224 So.2d 638 (1969), recognized "that at some point in time, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is free from defect." More recently, in Massey-Ferguson, Inc. v. Laird, 432 So.2d 1259, 1264 (Ala.1983), Justice Adams correctly stated the law in Alabama as follows:
"To the contrary, the seller does not have an unlimited period of time to repair and/or replace parts under a warranty. Tiger Motor Company v. McMurty, supra, and Riley v. Ford Motor Co., 442 F.2d 670 (5th Cir.1971). Given the numerous attempts at repair over the extended time period, the jury could properly conclude (as it presumably did, since it obviously awarded consequential damages) that the combine was not repaired within a reasonable time and that the limited warranty had failed of its essential purpose. (See Volkswagen of America, Inc. v. Harrell, 431 So.2d 156 (Ala.1983), and Winchester v. McCulloch Brothers Garage, 388 So.2d 927 (Ala. 1981)."
The jury verdict and the judgment entered thereon, in the amount of $73,500 on the warranty claim in favor of the Martins against Peterbilt Motors Company, is well within the range of recoverable damages proven at trial. All parties conceded, and the trial court instructed the jury, that the measure of damages applicable for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted. (See Ala.Code 1975, § 7-2-714(2), (3).)
The Manufacturer argues that the trial court erred in refusing to give two of its requested charges, which relate to the *950 damages recoverable in actions for breach of warranty. This argument is rejected. First, the requested charges are confusing and misleading, and, second, the trial court's oral charge correctly stated the law with regard to the damages recoverable on these claims.
We therefore affirm the judgment against Peterbilt Motors Company on the claim for breach of implied and express warranty in the amount of $73,500.
We reverse the judgment in favor of the Martins and against the Manufacturer on the fraud claim.
The jury returned the following verdicts:
1) "We, the jury, find in favor of Plaintiffs Joseph A. Martin and Joann Martin and against Defendant Peterbilt Motors Company, and assess their damages in the amount of $73,500."
2) "We, the jury, find in favor of the Plaintiffs Joseph A. Martin and Joann Martin and against Defendants Peterbilt Motors Company, Peterbilt of Mobile, Inc., and Grady M. (Chuck) Steele and assess their damages in the amount of $73,500."
It is apparent from the court's oral charge and the totality of the circumstances of this case that the jury intended a total verdict of $73,500 against Peterbilt Motors Company, not two such verdicts.
II. The Dealer and Steele
Like the Manufacturer, the Dealer and Steele argue only that the trial court erred in refusing to direct a verdict in their favor. It is the Dealer and Steele's argument that the Martins failed to present sufficient evidence of certain of the elements necessary to establish fraud under Ala.Code 1975, § 6-5-102, and, therefore, that the trial court should have directed a verdict in their favor. Again, we disagree.
There is evidence that the Dealer and Steele knew that a serious gear shifting problem existed in the new tractor that the Martins had ordered. After the Dealer installed the brake system, its mechanics discovered an electrical wiring defect that resulted in a failure of energy to the brake. The service manager called the Manufacturer, but got no help. Thereupon, the Dealer rewired the tractor "more or less in the dark." This cured the energy problem with the brake, but it did not correct the gear shifting problem. The Martins came to take delivery of the tractor, paid an additional $27,500, and signed a note for a balance of $87,672.
It has been settled for many years that a seller who misrepresents a material fact regarding a vehicle being sold will be liable on the basis of fraud. Likewise, this Court has addressed the question of liability resulting from suppression, holding in a particular case that liability results where the seller suppresses "a material fact ... which such seller was under obligation to communicate, in relation to the physical condition of the car, and particularly its batteries, as that was an inducement to the plaintiff to enter into the contract to purchase." Standard Motor Car Co. v. McMahon, 203 Ala. 158, at 160, 82 So. 188, at 190 (1919). The Court in McMahon continued:
"This rule has particular application to the representations as to the condition of the electric batteries of the automobile, a physical condition that could not be known by the plaintiff."
203 Ala. at 160, 82 So. at 190.
In Lowder Realty, Inc. v. Odom, 495 So.2d 23 (Ala.1986), Justice Adams, writing for the Court, said:
"Under Code 1975, § 6-5-102, the special circumstances that impose upon a party a duty to speak ... arise from the relationship of the parties; the value of the particular fact; the relative knowledge of the parties; and other factors. Berkel & Co. Contractors v. Providence Hospital, 454 So.2d 496 (Ala.1984)."
The Martins had ordered this tractor built to their specifications. They were over-the-road truckdrivers, not mechanics. They were not on an equal footing with the Dealer insofar as the technical aspects of manufacturing the tractor was concerned. In 1978 we held in Mathis v. Jim Skinner Ford, Inc., 361 So.2d 113 (Ala.1978):

*951 "Purchasers have a right to assume that new automobiles will perform in accordance with reasonable expectations and in accordance with implied representations inherent in marketing such products. Absent express representations, implied representations are not uncommon in the sale of new products, and reliance thereon may be shown by the totality of the circumstances and the underlying nature of the transaction itself. These concepts have long been recognized in actions based upon breach of an implied warranty, and, under proper circumstances, may support a tort action for misrepresentation."
The Martins ordered the tractor to use in order to earn their livelihood: it represented a significant capital outlay. The Dealer and Steele knew it was seriously defective, yet they took the Martins' money and promissory note, and delivered to them a tractor that barely made the trip from the dealership in Mobile to Opp, and said nothing about the defect they had discovered. At the least, they had a duty to disclose this fact. The jury was free to conclude that, the Dealer and Steele having suppressed this material fact and the Martins having shown substantial damages resulting from the condition of the tractor, the Dealer and Steele are liable.
We therefore affirm the judgment against Peterbilt Motors Company on the claim for breach of implied and express warranty in the amount of $73,500.
We reverse the judgment in favor of the Martins and against Peterbilt Motors Company on the fraud claim.
In affirming the judgment of $73,500 against Peterbilt Motors Company on the breach of warranty claim, and reversing the judgment in the same amount on the fraud claim, we are eliminating double recovery of compensatory damages.
We affirm the judgment against Peterbilt of Mobile, Inc., and Grady M. Steele in the amount of $73,500.
AFFIRMED IN PART AND REVERSED IN PART.
JONES and ADAMS, JJ., concur.
TORBERT, C.J., and STEAGALL, J., concur specially.
TORBERT, Chief Justice (concurring specially).
While I concur completely in the opinion, I feel compelled to point out that it appears that the plaintiffs may receive a double recovery. Because two separate judgments based on different theories of recovery were entered against separate defendants, arguably the plaintiffs will be able to collect a total of $147,000, when it is clear from the evidence that the plaintiffs' total compensatory damages are $73,500. No punitive damages are involved. However, no issue is raised on appeal as to whether the plaintiffs' total recovery is limited to $73,500.
STEAGALL, J., concurs.